Adam D. Ford (11363)
Richard W. Linford (01968)
Michelle Bushman (12048)
FORD & HUFF LC
10542 South Jordan Gateway, Suite 300
South Jordan, Utah 84095
Telephone: (801) 407-8555
Facsimile: (877) 721-6093

### IN THE UNITED STATES DISTRICT COURT IN AND FOR
### THE CENTRAL DISTRICT OF UTAH

| | |
|---|---|
| HAROLD J. JUDD DOMINGUEZ, DIANA SANCHEZ JUDD,  DIANA SHANTELL JUDD, and STEPHANIE MARBELLA JUDD, | **COMPLAINT** |
| Plaintiffs, | Case No. 2:10-cv-1074 |
| v. | Judge Bruce S. Jenkins |
| NUWORLD, INC., LIV INTERNATIONAL,  LIV INTERNATIONAL SA DE CV (MX), LIV SXINNEY, ZXOOM INTERNATIONAL, JOHN C. "BUD" HOLLINGSHEAD, JEFFERY ALLEN TUTTLE, LIV MANAGEMENT LLC, JAMES CRITTENDEN, LYLE HENDERSON, JOHN SALDANA, AND JOHN DOES I—X, | |
| Defendants. | |

Plaintiffs Harold J. Judd Dominguez and Diana Sanchez Judd and Diana Shantell Judd

and Stephanie Marbella Judd (collectively "Plaintiffs"), by and through their Ford & Huff LC

attorneys, Adam D. Ford and Richard W. Linford and Michelle Bushman complain and allege as

follows:

## NATURE OF ACTION

1.      This is an action to redress and obtain judgment against and damages from Defendants for harm they have caused Plaintiffs by Defendants' breaches of written contract and oral agreements; breaches of implied covenant of good faith and fair dealing; conversion; unjust enrichment/quantum meruit; defamation, libel, and slander; defamation *per se*; intentional and/or negligent infliction of emotional distress; intentional interference with economic advantage; breach of director and officer fiduciary duties; violations of Federal and State Securities and Exchange Commission regulations; and violation of trademarks.

2.      Plaintiffs seek compensation and damages pursuant to the above-stated laws.

## PARTIES AND JURISDICTION

3.      Plaintiff Harold J. Judd Dominguez ("Mr. Judd") is a Mexican citizen and a U.S. citizen. Mr. Judd has a residence in Mexico and is a resident of Utah County, Utah.

4.      Plaintiff Diana Sanchez Judd ("Mrs. Judd") is a Mexican citizen only.

5.      Mrs. Judd has a residence in Mexico and is a resident of Utah County, Utah.

6.      Plaintiff Diana Shantell Judd ("Shantell") is a Mexican citizen and U.S. citizen and is a resident of Utah County, Utah.

7.      Plaintiff Stephanie Marbella Judd ("Stephanie") is a Mexican citizen and a U.S. citizen and is a resident of Utah County, Utah.

8.      The defendant NuWorld, Inc. is a Utah corporation with its principle offices at 727 North 1550 East, Suite 300, in Orem, Utah.

9.      The defendant Liv International is a dba of NuWorld, Inc. with its principle offices at 727 North 1550 East, Suite 300, in Orem, Utah.

10.     The defendant Liv International SA DE CV (Mx) is a Mexican corporation and dba of Liv International with its principle offices at 727 North 1550 East, Suite 300, in Orem, Utah.

11.     The defendant Liv SXinney and Crave are products of Liv International but are also referenced and on occasion treated as a dbas of NuWorld Entities such names also being used interchangeably with and to reference Liv International and Liv International SA DE CV (Mx) with principle offices at 727 North 1550 East, Suite 300, in Orem, Utah.

12.     The defendant ZXoom International is a dba of NuWorld with its principle offices at 727 North 1550 East, Suite 300, in Orem, Utah.

13.     The defendants NuWorld, Inc., Liv International, Liv International SA DE CV (Mx), Liv SXinney, Crave, and ZXoom International are hereinafter referred to as "NuWorld Entities." or "the Company."

14.     The defendant John C. "Bud" Hollingshead ("Mr. Hollingshead") is a director and officer (Chairman and acting CEO) of the NuWorld Entities and is a resident of Davis County, Utah.

15.     The defendant Jeffery Allen Tuttle ("Mr. Tuttle") is an officer (President) of NuWorld Entities and is a resident of Utah County, Utah.

16.     The defendant Liv Management LLC is a Utah limited liability Company organized by Mr. and Mrs. Jeffery Allen Tuttle.

17.     The defendant James Crittenden ("Mr. Crittenden") is a director of NuWorld Entities and is a citizen and resident of Park City, Utah appointed by Mr. Hollingshead approximately 27 November 2007.

18.     The defendant Lyle Henderson ("Mr. Henderson") is a director of NuWorld Entities and is a citizen and resident of Pocatello, Idaho appointed by Mr. Hollingshead approximately 27 November 2007.

19.     The defendant John Saldana ("Mr. Saldana") is an officer of NuWorld Entities (CIO) and is a resident of Utah County, Utah.

20.     The defendants John or Jane Does I—X are other individuals, including directors and/or officers of the Company, who may be joined in this case.

21.     The majority of the agreements, contracts, and acts which are the basis of and for this action occurred primarily in Utah County, but other known agreements, contracts, and acts occurred in Salt Lake County and Davis County, State of Utah.

22.     Some of the known agreements, contracts, and harmful and illegal acts of Defendants as set forth in this Complaint reached and occurred and continue to reach and occur across state and federal lines.

23.     Some of those same agreements, contracts, and illegal acts of Defendants reached and continue to reach into Mexico.

24.     The NuWorld Entities do business internationally including in Mexico.

25.     Jurisdiction is conferred on the United States District Court by 28 U.S.C. § 1331.

4

26.     The Court has supplemental and pendent jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

27.     The Court also has jurisdiction over this action pursuant to Sections 11, 12(a)(2), 15, 17(a), 10b and Rule 10b-5 of the Securities Act of 1933 ("Securities Act"). Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and course of business alleged in this Complaint. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 USC 77v(a) and Section 27 of the Exchange Act, 15 USC 78aa, because certain of the transactions, acts, practices and course of conduct constituting violations of the federal securities laws occurred within this district, and all of the defendants reside and/or are located in this district.

28.     Most of the causes of action alleged in this complaint were committed in the District of Utah and venue is proper in this District pursuant to 28 U.S.C. §§ 1391 (b) and (c).

## <u>GENERAL ALLEGATIONS</u>

### Formation of NuWorld Entities

29.     Mr. Judd and Mr. Hollingshead are the two co-founders of NuWorld Inc. having co-founded NuWorld Inc on or about May 27, 2005.

30.     Mr. Judd has been and is an experienced, knowledgeable, and able leader and CEO and officer of multi-level-marketing ("MLM") businesses having worked in the industry since 1993.

31.     Mr. Hollingshead is experienced in finance and had little or no experience in MLM prior to co-founding of NuWorld, Inc with Mr. Judd on or about May 27, 2005.

32.     On or about May 25, 2005, Mr. Hollingshead and Mr. Judd determined that they would form an MLM Company.

33.     The Letter of Commitment ("Contract") was signed on May 27, 2005. (See Exhibit A—Contract).

34.     NuWorld Inc. was registered June 21, 2005.

35.     The name of the company and the names for products were discussed and decided in June and July, 2005.

36.     On May 27, 2005, Defendant Mr. Hollingshead signed the "Contract" as "Co-Founder and CEO" and personally. NuWorld Inc. on that date was not in existence. (Exhibit A.)

37.     Mr. Judd signed the same "Contract" personally and as President on May 27, 2005. (Exhibit A.)

38.     The "Contract" is a valid and binding written agreement with terms binding on NuWorld Entities and binding on Mr. Hollingshead personally and as a director and an officer (Chairman) of NuWorld, Inc. (Exhibit A.)

39.     This May 27, 2005 Contract was a "co-founder contract" and not an "at will employment contract." (Exhibit A.)

40.     The Contract established Mr. Judd's 20% undiluted and non-dilutable ownership in NuWorld, Inc. and its associated entities. This "Contract" was not, has not been, and is not abrogated in any way. (Exhibit A.)

41.     Subsequent oral promises and representations made to Mr. Judd by Mr. Hollingshead confirmed and reaffirmed the validity of this Contract. (Exhibit C—Affidavit of Mr. Judd.)

42.     Mr. Hollingshead and the company started and continued to pay Mr. Judd's salary starting June 1, 2005 and continued to do so through April of 2008.  (Exhibit C.)

43.     On or about June 25, 2005, Mr. Judd asked Mr. Hollingshead to give him stock certificates for Mr. Judd's 20% interest in the Company.

44.     On or around January 2006, Mr. Judd again asked Mr. Hollingshead to give him his stock certificates when Mr. Hollingshead issued the Private Placement Memorandum (PPM), and Mr. Judd asked for his stock certificates again on or around January 2008. (Exhibit C, Exhibit D— John Hollingshead PPM.)

45.     On or around January 2008, a meeting was held specifying that Mr. Hollingshead had 20% and Mr. Judd had 20% ownership of the Company.

46.     After establishing Mr. Judd's 20% ownership in 2005, this was ratified multiple times - in 2006, again in 2007, again in 2008 – several different times a year—Mr. Judd's 20% was discussed in worksheets and meeting minutes. The latest were December 6 of 2008 and May 18, 2009.  (Exhibits C and E).

47.     Mr. Judd also had similar discussions with Mr. Hollingshead in 2007 and 2009 asking him to give Mr. Judd's stock. (Exhibit A and C.)

48.     In August of 2005, Mr. Judd was appointed Chief Executive Officer (CEO) of NuWorld Entities by Mr. Hollingshead. Mr. Judd continued to bear the title CEO of NuWorld Entities until the time of his termination.

49.     In August of 2005, Mr. Hollingshead relinquished his title of CEO and retained the title as/of Chairman of NuWorld Entities. However, in the June 4, 2009 termination letter sent to Mr.

Judd, Mr. Hollingshead signed the document as Chairman and Acting CEO. (Exhibit B—Termination Letter)

50.     Mr. Hollingshead throughout the history of NuWorld Entities from its inception on May 27, 2005 until today has "called most of the shots" for the NuWorld Entities. (Exhibit C)

51.     NuWorld dbas Liv International, Liv SXinney, and ZXoom International were "co-founded" by Mr. Judd, Mr. Hollingshead, Mr. Tuttle, Mr. Saldana and Jesse Judd.

52.     It is believed by Mr. Judd that Liv International dba Liv International SA DE CV (Mx) was co-founded by Mr. Hollingshead and Mr. Tuttle.

53.     It is believed by Mr. Judd that Liv International SA DE CV is incorporated in Mexico in the name of Jose Bismarck Martinez.

54.     Liv International filing for Liv International SA DE CV (Mx) in Mexico was formed by Mr. Hollingshead and Mr. Tuttle without informing Mr. Judd.

55.     Liv International filing for Liv International SA DE CV (Mx) in Mexico was formed several months prior to and in anticipation of Mr. Judd's termination from the Company.

56.     From 2005 until the present, co-founder Mr. Hollingshead controlled registration of NuWorld, Inc. and each of the dba NuWorld Entities Liv International, and ZXoom International and Liv International SA DE CV (Mx) and registered each of them in his name personally.

57.     Upon information and belief, Liv International SA DE CV (Mx) is registered in the names of Mr. Hollingshead and Mr. Tuttle.

58.     Mr.  Crittenden and Mr.  Henderson are formally listed as members of the NuWorld Entities' Board of Directors in Mr. Hollingshead's filings.

59.     On information and belief, Mr. Tuttle acted as a director of the NuWorld Entities' Board of Directors. (Exhibit C)

60.     Mr. Crittenden and Mr. Henderson became investors in 2006. They were announced as directors by Mr. Hollingshead, without Mr. Judd's approval, in 2007.

61.     Liv SXinney and Crave are most often referred to as products although these names are used interchangeably with Liv International and when referred to as Liv International are not properly registered as dbas or corporations.

62.      Liv SXinney and Crave are the flagship products of Liv International and are not business entities registered with the state of Utah.

63.     As of 2010, Mr. Hollingshead was (and remains) the NuWorld Entities' registered agent with the state of Utah.

64.     Mr. Hollingshead tightly controls NuWorld Entities making decisions for the NuWorld Entities as if he were independent of the Board of Directors and Officers, brooking no opposition from others. (Exhibit C)

65.     Mr. Judd held the title of CEO of the NuWorld Entities' world-wide operations from approximately August of 2005 until he was terminated in 2009 by Mr. Hollingshead as Chairman and ostensibly by the Board of Directors Mr. Hollingshead, Mr. Crittenden and Mr. Henderson and any other members of the Board. (Exhibit C and B)

66.     NuWorld Entities is a closely held Company, with a small number of directors, officers and employees (approximately 7 people – Mr. Hollingshead, Mr. Tuttle, Mr. Saldana, Ms. Lianne Bremer, Mr. Jeff Bean, a receptionist and a customer service person.)

67.     Since Mr. Judd's termination, the Company is now operated primarily by Mr. Hollingshead as chairman and acting CEO and Mr. Tuttle as president.

68.     Mr. Saldana holds a lesser role as CIO reporting to Mr. Hollingshead. Mr. Jeff Bean is vice president global operations manager at a level below reporting to Jeff Tuttle. Lianne Bremer is vice president of global marketing reporting to Jeff Tuttle.

69.     As mentioned, there are two directors, although Mr. Tuttle and Mr. Saldana serve as directors (functionally, if not in name) as well as President and CIO, respectively.

70.     On information and belief of Mr. Judd, from 2007 to 2009, few if any Board meetings and no shareholder meetings were held by Mr. Hollingshead where Directors or shareholders were able to vote on Company matters.

71.     From 2005 into 2009, NuWorld Entities held Company staff meetings weekly with most of them presided over by Mr. Judd.

72.     Mr. Hollingshead attended those meetings sporadically but these meetings did not serve as Board Meetings or shareholder meetings.

73.     Under Mr. Judd's direction as CEO and as an MLM professional the NuWorld Entities were successful in the United States.

74.     Company revenues climbed from $0 per month in 2005 to $365,000 per month in May of 2009.

75.     Mr. Judd also had oversight for and was CEO of the NuWorld Entities' Mexico operations from July of 2006 until the date of his termination.

76.     Mr. Judd hired Jeff Tuttle to be a manager at NuWorld Entities in July of 2005.

10

77.     Mr. Tuttle was given oversight for sales, marketing and product formulations.

78.     Mr. Hollingshead gave Mr. Tuttle a 5% ownership interest in the Company in July 2005.

79.     Mr. Hollingshead and Mr. Judd appointed Mr. Tuttle to be the President of NuWorld Entities approximately September of 2006.

80.     In August of 2008, Mr. Judd moved to Mexico to oversee the Company's Mexican operations which were less successful than U.S. operations.

81.     Mr. Judd continued to take part in weekly NuWorld Entities' staff meetings and preside over them by telephone and webinar until June 4, 2009.

82.     In August of 2008, Mr. Judd left U.S. business operations to the care of Mr. Tuttle who was president.

83.     In 2007, when Mr. Tuttle began to invest his own money in the Company, Mr. Tuttle became dissatisfied with his mere 5% ownership in NuWorld Entities.

84.     According to the Liv International Website, Mr. Tuttle now claims the status of sole founder of the NuWorld Entities, exclusive of any other co-founders.

85.     Mr. Tuttle effectively acted as a member of the Board of Directors from July 2005 forward.

86.     During second quarter of 2008 thru December 2009, Mr. Tuttle made negative statements concerning Mr. Judd to key distributors Lorrie Dyer, Cori Dyer, Martha Chavez—each had his or her own MLM downline. (Exhibit C)

87.     These negative comments caused these key distributors to forego conducting business with Mr. Judd. (Exhibit C)

88.     On information and belief of Mr. Judd, only 8% of the stock in NuWorld Entities had not been issued at the time of Mr. Judd's termination.

**Mr. Judd's Wrongful Termination from NuWorld Entities**

89.     On June 4, 2009, Mr. Hollingshead (and ostensibly the Board) terminated co-founder Mr. Judd, by emailing a letter to Mr. Judd that "removed" Mr. Judd as "Chief Executive Officer" and "from all other offices you may hold in the Company." (Exhibit B.)

90.     This same June 4, 2009 letter acknowledges and documents that Mr. Judd was CEO of NuWorld Entities from October of 2005 until the date of his termination.

91.     The Termination Letter (Exhibit B) states that "the Company will act immediately and strongly to defend and protect the interests and property of the Company should you decide to try to misappropriate Company assets or relationships to your own use."

92.     The Termination Letter states and confirms that Mr. Judd did not misappropriate Company assets or relationships for his own or his family use prior to the date of his termination.

93.     No formal Company accusations have been made that Mr. Judd misappropriated Company property, assets or relationships to his own use prior to his termination. (Exhibit C)

94.     The Termination Letter admits and evidences on its face that Mr. Judd did not and had not overstepped his bounds as CEO.

95.     The Termination Letter (Exhibit B) states that "the Board of Directors does not wish you ill," but next threatens and intimidates Mr. Judd by stating "It will be in your interest not to cause a change in that attitude."

96.     The Termination Letter states no grounds for the termination of Mr. Judd and no other formal explanation has been provided directly to Mr. Judd for his termination.

97.     No formal or informal Company accusations of civil or criminal wrongdoing were given to justify Mr. Judd's termination.

98.     What we have is one primary co-founder Mr. Hollingshead who "calls the shots" and a President ousting the other primary co-founder.

99.     There was no opportunity for a fair hearing, no opportunity for face to face dialogue, given by Mr. Hollingshead and the Board of Directors and Mr. Tuttle to Mr. Judd.

100.    Under the Articles of Incorporation, as the Chairman and equal owner and co-owner of NuWorld Entities, Mr. Hollingshead does not have the authority to terminate co-founder and major shareholder Mr. Judd acting on his own or with concurrence of the Board of Directors.

101.    By terminating Mr. Judd, Mr. Hollingshead and the other Defendants breached the written Contract.

102.    Members of the Board of Directors who were involved in the decision to terminate Mr. Judd were either complicit with Mr. Hollingshead's actions or were misinformed.

103.    After terminating Mr. Judd, Defendants took and converted to their own use Mr. Judd's 20% undiluted and non-dilutable interest in the Company, his back salary and back expenses.

104.    Mr. Judd was terminated because Mr. Hollingshead, the Directors and Mr. Tuttle, and Does I—X wished to oust him from the Company in order to convert to their and the Company's use Mr. Judd's shares in the Company, his salary and expenses he is owed by the Company.

105.    Mr. Hollingshead in 2009 prior to Mr. Judd's termination suggested that Mr. Judd was setting up his own Company using the NuWorld Entities names and products.

106.    Mr. Judd and his wife emphatically deny any and all such unverified rumor. (Exhibit C.)

107.    Mr. Judd performed his duties from 2005 until the date of his termination well and to the benefit of the Company.

108.    Mr. Judd herein asks to be reinstated to his rightful position as CEO.

**Mr. Judd's Unpaid Wages and Unreimbursed Business Expenses**

109.    Before and at time of Mr. Judd's termination and thereafter, the Defendants did not pay and have refused to pay Mr. Judd $165,768 in salary which is owed to him. (Exhibit C.)

110.    On or around September of 2009, Mr. Hollingshead also personally put a stop payment on Mr. Judd's lawful salary checks, totaling $12,000, after said funds had cleared the bank and been paid to Mr. Judd. (Exhibit C.)

111.    As a result of this stop payment, the deposits were reversed and $12,000 was charged to Mr. Judd's bank account.

112.    Before and at time of Mr. Judd's termination and thereafter, the Defendants did not pay and after requests by Mr. Judd have refused to pay Mr. Judd $177,793 in expenses documented by expenses reports. (Exhibit C.)

113.    Mr. Judd spent his own funds on behalf of the business. (Exhibit C.)

114.    Mr. Judd submitted expense reports in the normal course of business and was sometimes partially reimbursed for those expenses by check cut by Eileen Tuttle, the bookkeeper and wife

of Jeff Tuttle who controlled some of the Company accounts, from Company checking accounts. (Exhibit C.)

115.    At the time of Mr. Judd's termination and thereafter, Defendants also refused to pay Mr. Judd the following:  $22,050.00 for furniture rentals to NuWorld, Inc.; $9,600 for rent of the NuWorld Mexico office; and $12,800 in lost health benefits. (Exhibit C.)

116.    By terminating Mr. Judd and failing to pay Mr. Judd the expenses he was owed, Defendants breached the written Contract (Exhibit A and C.)

117.    Defendants breached Company policy. (Exhibit A and C.)

118.    Defendants breached Company procedure. (Exhibit A and C.)

**Theft, Misappropriation, and Conversion of Mr. Judd's Stock in the NuWorld entities**

119.    Mr. Judd owns an undiluted non-dilutable 20% of the Company NuWorld and its dba entities Liv International, Liv SXinney, ZXoom International. (Exhibits A and C.)

120.    Mr. Judd also owns an undiluted non-dilutable 20% ownership in Liv Management LLC. (Exhibits A and C.)

121.    As the two primary co-founders of the Company NuWorld Entities, Mr. Judd and Mr. Hollingshead agreed that their ownership in the business would be equal. (Exhibits A and C.) Mr. Hollingshead therefore also owned 20% of the Company.

122.    Mr. Judd and several directors confronted Mr. Hollingshead and told him that his percentage of the Company would be reduced to 8% given the fact that Mr. Hollingshead did not provide needed funding as he promised. (Exhibits A and C.)

123.     Mr. Hollingshead promised Mr. Judd that he and NuWorld would give Mr. Judd stock certificates reflecting Mr. Judd's 20% interest in the business. (Exhibit A and C.)

124.     To the great harm of Mr. Judd and his family, Mr. Hollingshead and the Board of Directors and Mr. Tuttle failed to give Mr. Judd's these stock certificates. (Exhibits A, B, and C.)

125.      The terms of the Agreement and other oral promises were breached by Defendants to Mr. Judd's serious harm. (Exhibits A and C.)

126.     To the harm of Mr. Judd and his family, Mr. Tuttle as President and member of the Board of Directors and the other members of the Board of Directors knew and were complicit in the taking of Mr. Judd's interest and stock in the Company.

127.     Mr. Tuttle and the members of the Board of Directors were complicit with Mr. Hollingshead in the ousting of Mr. Judd from the business and in their refusing to issue Mr. Judd's stock certificates. (Exhibit C.)

128.     UCA 16, 10a Section 625 regarding Form and content of certificates reads: "Shares may but need not be represented by certificates. Unless this chapter or another applicable statute expressly provides otherwise, the rights and obligations of shareholders are not affected by whether or not their shares are represented by certificates."  Notwithstanding the actions of Defendants to-date, Mr. Judd does own a 20% undiluted and non-dilutable interest in the Company as granted by the Contract (Exhibit A.) Mr. Judd's 20% interest could only be diluted by Mr. Judd which he did not do. (Exhibit A.)

129.    The NuWorld Entities including the product formulations, distributor network, product production, distribution relationships and systems, and the business plans were and are valuable in their current state and in their future state.

130.    Mr. Judd's damages due to Defendants' actions constitute an amount not less than $100 million, the exact amount to be determined at trial.

**Mismanagement of the NuWorld Entities and Breach of Fiduciary Duties**

131.    To the harm of Mr. Judd and his family, Defendants breached written and unwritten Company policy and state and federal laws mandating

      a.   payment of salaries,
      b.   payment of other obligations including expenses,
      c.   payment of payroll taxes, and
      d.   payment of Social Security taxes.

132.    Mr. Hollingshead did not file and pay certain federal payroll taxes. (Exhibit C.)

133.    Mr. Hollingshead did not file certain social security taxes from 2005 through at least 2008. (Exhibit C.)

134.    Mr. Hollingshead falsified Mr. Judd's W2 for 2006. (Exhibit C.)

135.    In 2007, Mr. Hollingshead stated to Mr. Judd and Mr. Tuttle that he was keeping/paying payroll taxes current.

136.    Payroll taxes included federal and state payroll taxes and social security contributions.

137.    In 2007, Mr. Tuttle met with his brother on taxes and began to do research. They discovered that Mr. Hollingshead had not kept the Company up to date on payroll taxes.

138.    Mr. Tuttle disclosed this to Mr. Judd and the two of them in the first or middle part of

2007 confronted Mr. Hollingshead with their newly found information. At the time, approximately $240,000 in payroll taxes was owed. (Exhibit C.)

139.    At a later day this amount had grown to as much as $300,000 owed to the IRS plus penalties. This was tantamount to bankruptcy of the Company. (Exhibit C.)

140.    This information about unpaid payroll taxes was only uncovered by a fluke of personal research and this because it was before that time kept secret by Mr. Hollingshead.

141.    Mr. Judd confronted Mr. Hollingshead and blew the whistle in 2007, 2008 and 2009 alleging that Mr. Hollingshead did not properly pay payroll taxes, failed to pay social security taxes, issued a false W2, and failed to disclose the fact that the Company was in serious debt to potential and actual accredited and non-accredited investors, and by failing to give Mr. Judd's stock as promised. (Exhibit C.)

142.    Mr. Hollingshead controlled all fund raising for the business from 2005 thru 2010 but did not conform to Federal and State Securities laws in soliciting and obtaining capital because he did not disclose the huge payroll tax liability to potential and actual investors. (Exhibit C.)

143.    Mr. Hollingshead promised to raise sufficient funds in 2005 and multiple times thereafter (including in 2009) to support the on-going growth of the business in a timely fashion. (Exhibit C.) Mr. Hollingshead did not keep this promise.

144.    Had Mr. Hollingshead provided the funding he promised from 2005 to 2010, Mr. Judd's undiluted and non-dilutable 20% stake in the Company would be immensely more valuable today.

145.    In December of 2008 and in May of 2009, as CEO and a majority owner, Mr. Judd challenged and blew the whistle on Mr. Hollingshead for wasting Company assets by taking out a loan at 18% interest per month to fund a Company cruise. (Exhibit C.)

146.    On information and belief of Mr. Judd, the loan made in December of 2008 may have been used to recover for investor(s) some of the money Mr. Hollingshead invested in the Company. (Exhibit C.)

147.    Eileen Tuttle, wife of Mr. Tuttle, was from 2005 and is today bookkeeper for Company matters regarding sales and expenses.

148.    From 2005 thru 2009, accounting and banking and disbursements with regard to payroll and investors and financing were tightly controlled by Mr. John Hollingshead in other sets of books out of his office and his accounts or accounts he controlled. Mr. Hollingshead sent out the W2s annually.

**Harassment and Retaliation for Whistle blowing**

149.    In 2007, 2008, and 2009 Mr. Judd challenged Mr. Hollingshead and the Directors about failure to pay payroll taxes.

150.    In December of 2008, Defendants' conduct exhibited to Mr. Judd that he was no longer welcome at corporate headquarters. In February of 2009, such conduct was pronounced.

151.    Mr. Hollingshead wrongfully terminated Mr. Judd on June 4, 2009.

152.    Defendants also retaliated against Mr. Judd and his family as early as 2009 when they began pressuring Mr. Judd's daughters to leave the Company.

153.   Shortly before Mr. Judd's wrongful termination, the Defendants emailed Plaintiff
Shantell Judd and informed her of alleged complaints about her. They then demoted her to a
back cubicle to work only with the Mexican distributors. (Exhibit E—Affidavit of Shantell
Judd.)

154.   This demotion was in spite of the fact that Jeff Tuttle's daughter and niece, who held
similar positions, made many errors and were not demoted. (Exhibit E.)

155.   Defendants began to make harassing statements to Shantell, including advocating the
removal of her father from the Company and blaming him for insufficient funds. (Exhibit E.)

156.   Defendants also pressured Stephanie to quit shortly before Mr. Judd was terminated in or
about May of 2009.  (Exhibit E—Affidavit of Stephanie Judd.)

157.   In spite of her physical limitations following her car accident, Stephanie was relegated to
work in the back room and given heavy lifting work.  (Exhibit E.)

158.   Mr. Tuttle and Mr. Saldana told Stephanie that customers were complaining about her; in
fact, Stephanie was working in the back room and not working with customers at the time.

159.   Mr. Saldana was Stephanie's boss.

160.   Mr. Saldana repeatedly made lewd and inappropriate comments to Stephanie.

161.   These comments included asking Stephanie in August of 2008, after she was contacted
by a modeling agency, whether she would be doing nude or lingerie pictures "so [he] could get
the magazine." Mr. Saldana made other such comments on a regular basis. (Exhibit E.)

162.    Shantell was similarly subject to inappropriate comments and lewd stares from Mr.
Saldana.  These comments included asking Shantell if she had sex toys and if she would play

with them; and if she would ever hook up with a girl, or with two or more people at a time.

(Exhibit E.)

163.    Mr. Saldana would regularly attempt to touch Mr. Judd's daughters by placing his arm

around their shoulders or rubbing their necks. (Exhibit E.)

164.    Mr. Hollingshead was aware of this harassment and did nothing to stop it.

165.    Mr. Tuttle was aware of this harassment and did nothing to stop it.

166.    As part of this pattern of harassment of the Judd family, Defendants wrongfully:

167.    Forced Jesse Judd to quit in March 2009;

168.    Forced Stephanie to quit in May of 2009;

169.    Terminated Harold Judd in June of 2009; and

170.    Forced Shantell to quit in June of 2009;

171.    All of this harassment of the family occurred within the space of four months in 2009.

### Defamatory, Libelous and Slanderous Statements of Defendants

172.    Defendants Mr. Tuttle and Mr. Saldana in 2008, in 2009 and in January and August of

2010 contacted distributors by phone and emails indicating Mr. Judd had worked without ethics

and accusing him of theft. (Exhibit C.)

173.    In second quarter of 2008, Jeff Tuttle turned the largest distributors against Mr. Judd.

(Exhibit C.)

174.    In July of 2009, Mr. Hollingshead called Jesse Judd and said that Harold was a thief. Id.

175.    In January of 2010, Mr. Tuttle called Lorena Uribe and told her Mr. Judd had no ethics

and had spent their money with no results. Id.

176.    In November of 2009, Mr. Tuttle stated to Ms. Uribe that Harold had stolen from them, and that he had lied to them and to everyone. Id.

177.    Mr. Tuttle cautioned Ms. Uribe to "beware of the false promises of Harold" to which Ms. Uribe replied that she believed and trusted Harold totally because he had earned that trust. Id.

178.    On or about May 5, 2009, Elizabeth Wahl, a distributor for the Company, called Harold to report that a Company employee had said on the phone that Harold didn't work there anymore. She asked for Jesse and was told Jesse didn't work there. (Exhibit C.)

179.    Starting approximately June 4, 2009, Defendants made phone calls and sent emails to top distributors and others stating therein that Harold Judd took things from the Company and wrongfully lived off the Company. (Exhibits E and C.)

**Defamatory Letter Sent to Company Distributors**

180.    On June 25, 2009, Defendants' Attorney Mr. Thorup, emailed to Mr. Judd and many, if not all, Company distributors in U.S. and Mexico a letter. (Exhibit F.)

181.    This letter ("Email Defamatory Letter") states that Mr. Judd converted the Company Mexico offices and facilities to his own use and benefit which Mr. Judd denies.  (Exhibit F.)

182.    In fact, the Company office in Mexico operated out of his residence, owned by his wife. (Exhibits C and E.)

183.    The Email Defamatory Letter also states Mr. Judd converted to his financial benefit Company product inventory, marketing videos and other AV materials which Mr. Judd denies. (Exhibit F.)

184. All Company product(s) in Mexico were either lost through normal wear or sold in the ordinary course of business.

185. Mr. Judd has also given an accounting that neither he nor his wife or family have use or received benefit from such. (Exhibit C.)

186. Defendants also stated in the Email Defamatory Letter that Mr. Judd stole $15,000 which Mr. Judd denies. The amount in question was 39,423 pesos which is approximately $2,975, in the NuWorld Mx account.  The account still exists as a working account for NuWorld Mx. (Exhibits E and C.)

187. The $2,975 which was in the account when Mr. Judd was terminated was simply used for NuWorld Mx ongoing operations to pay liabilities accrued prior to Mr. Judd's termination.

188. This money did not inure to the financial benefit of Mr. Judd and his family.

189. The Email Defamatory Letter states Mr. Judd "illegally interfered with the Company's contractual relationships with its Mexican distributors by emailing and phoning information instructing them to no longer deal with the Company and to forward all sales" to him which Mr. Judd denies. (Exhibit C.)

190. The Email Defamatory Letter also alleges Mr. Judd set up a website for his separate company NuWorld Mx which Mr. Judd denies.

191. Mr. Judd does not deny that he set up a website in April of 2009.

192. Mr. Judd set up the website so that NuWorld distributors would have information for the products that they were selling which information was not available on the U.S. website.

193. Mr. Saldana and Mr. Tuttle were aware of and approved of that website.

23

194.    The trademarks listed in the Email Defamatory Letter in the U.S. do belong to the Company NuWorld Inc. or its dbas.

195.    In Mexico those same trademarks belong to NuWorld Mx.

196.    Mr. Judd and his wife legally own 100% of NuWorld Mx.

197.    NuWorld MX legally owns the trademarks Liv SXinney, Crave, NuVital and Timp.

198.    Finally, the Email Defamatory Letter alleges Mr. Judd entered Company offices after hours and took files of the Mexican distributors for his personal use which Mr. Judd emphatically denies. (Exhibit F.)

199.    In fact, days prior to Mr. Judd's termination, and without any knowledge that he was going to be terminated, and knowing that his effects had been boxed up and placed in the warehouse by Mr. Tuttle and Mr. Saldana, Mr. Judd visited the offices after hours to retrieve his suits and personal decorations and items. Mr. Judd did not take Company property. He took his own personal effects. (Exhibit C.)

200.    This email Defamatory Letter further seeks to intimidate Mr. Judd with the threat of litigation.

201.    This defamatory email was sent to hjudd@gmail.com, a non-existent email; to haroldjudd@liv.com which is a non-existent email which Mr. Judd has never had; and to harold@nuworld.com.mx which hosting company NuWorld Entities had wrongfully canceled.

202.    This defamatory e-mail was sent to three non-existent email addresses so Mr. Judd would not have notice.

203.    This defamatory email was also sent to all distributors in the U.S. and Mexico.

## Defamatory E-mail Sent to Mexican Distributors

204.   Beginning June 29, 2009, Defendants Mr. Tuttle, Mr. Saldana, and other Defendants sent

an e-mail to all Mexican Pickup Center Directors (i.e., distributors). The e-mail was titled

"ANUNCIO IMPORTANTE DE NuWorld, Inc. (Liv International)"; or, in English, "Important

Announcement from NuWorld, Inc. (Liv International)" ("Announcement") (Exhibit H—July 2,

2009 Announcement).[1]

205.   This Announcement was sent to additional Mexican distributors on July 2 and 3, 2009.

206.   The Announcement states, "As you know, in the last communications Harold Judd has

been trying to take possession of our business in Mexico. As you have seen in the last

communications, he has no right to trademarks, products, or any patents." (Exhibit H.)

207.   The last communications referred to in the Announcement include the June 25, 2009

Email Thorup Letter, which had been previously sent to the Mexican distributors by Defendants.

208.   The Announcement continues, "Thank you for your patience during the last actions

which have occurred due to the lack of ethics and leadership of Harold." (Exhibit H.)

## Further Defamatory and Harassing Communications

209.   Defendants have also alleged by hearsay in their letters to hosting companies in June of

2009 and in August of 2010 that Mr. Judd was not honest and stole Company copyrights,

trademarks, names and websites. (Exhibit G—Letters to Web Hosting Companies)

210.   These trademarks, copyrights, etc. were placed in the name of his wife and brother as part

of the normal course of doing business in Mexico. (Exhibit C.)

---

[1] Ford & Huff has provided the Court with a translation into English of the July 2, 2009 Announcement. This
translation, prepared by Harold Judd, is attached to the Complaint (with the original e-mail) as "Exhibit H".

211.    Any such trademarks, etc. were registered in and used in the normal course of Company business in Mexico up to the date of Mr. Judd's termination. (Exhibit C.)

212.    By comparison, all U.S. companies are in the name of Mr. Hollingshead with the exception of Liv Management which is linked to Mr. and Mrs. Tuttle. (Exhibit C.)

213.    On August 2009, Defendants defamed, libeled and slandered Mr. Judd and his wife to a lady in El Paso, Texas by the name of Raquel Chavira. (Exhibit E.)

214.    Mr. John Hollingshead called Mr. Judd's brother Jesse in August of 2009 and November/December of 2009 stating "your brother is a thief," and stated "one phone call from me to the IRS and Harold will be as guilty as I am." (Exhibits E and C.)

215.    False accusatory emails were sent and similar phone calls were made to distributors and service providers with one dated June 25, 2009 and others in August of this year 2010. (Two or three emails were sent to the website hosting company Hostway.) (Exhibits C and E and G.)

216.    Defendants have also sent defamatory and threatening and intimidating letters to Mr. Judd's website hosting service twice now – once in June of 2009 and again in August 2010. (Exhibit G.)

217.    Defendants also falsely stated Mrs. Judd was in collusion and complicit with Mr. Judd – that "Mr. Judd stole Company property and she was as guilty." (Exhibit C.)

218.    Mr. Judd has accounted for all Company property and has given the attached signed and notarized Affidavit and Accounting to Ford & Huff LC. (See Exhibit C.)

**NuWorld Mx, Trademarks, Products, and Sales**

219.    NuWorld Mx is a separate Mexican corporation registered in the names of Mr. Harold J.

Judd Dominguez and his wife Diana Sanchez Judd as of March of 2010.

220.    Mr. Judd did not sign a non-compete and or non-circumvention agreement with NuWorld

Entities.

221.    Product NuVital is trademarked in the U.S. by NuWorld Entities, and in Mexico under

first use doctrine by NuWorld Mx.

222.     NuWorld Mx was the first to use the NuVital trademark in Mexico.

223.    Product Timp is trademarked in the U.S. by NuWorld Entities, and trademarked in

Mexico by NuWorld Mx under first use doctrine.

224.    NuWorld Mx was the first to use the Timp trademark in Mexico.

225.    The product Liv SXinney is trademarked in Mexico by NuWorld Mx/by Mr. Harold J.

Judd Dominguez as of August 2010.

226.    NuWorld Mx was the first to use the Liv SXinney trademark in Mexico.

227.    The product Crave is trademarked in Mexico by NuWorld Mx/by Mr. Harold J. Judd

Dominguez. as of August 2010.

228.    NuWorld Mx was the first to use the Crave trademark in Mexico.

229.     On August 10, 2010, NuWorld Inc and Liv International violated NuWorld Mx/Mr.

Judd's trademarks for NuVital by sending a letter to Hostway Corporation via attorneys which

letter defamed Mr. Judd.

230.    On August 10, 2010, NuWorld Inc and Liv International violated NuWorld Mx/Mr. Judd's trademarks for Timp by sending a letter to Hostway Corporation via attorneys.

231.    On information and belief, prior to establishment of Liv International Mx, NuWorld Entities in violation of Mexican import laws sold Liv SXinney and Crave products to distributors in the U.S. knowing that distributors would take the product into Mexico for resale.

232.    In doing so, NuWorld Entities violated NuWorld Mx's trademarks for Liv SXinney and Crave.

233.    In doing so, NuWorld Entities violated Mexican import laws.

## CAUSES OF ACTION

### First Cause of Action
### Personal Liability of Mr. Hollingshead for wrongful acts

234.    Plaintiffs reallege and incorporate by reference each and every fact and allegation contained in the preceding paragraphs of this Complaint.

235.    In addition, Utah Code Ann. § 16-10a-204 states: "All persons purporting to act as or on behalf of a corporation, knowing there was no incorporation—are jointly and severally liable for all liabilities created while so acting."

236.    Under Utah Code Ann. § 16-10a-204, Mr. Hollingshead is personally liable for his wrongful actions, as detailed further in the Complaint.

### Second Cause of Action
### Breach of Contract and Oral Agreements

237.    Plaintiffs reallege and incorporate by reference each and every fact and allegation contained in the preceding paragraphs of this Complaint.

238.    Defendants breached the written Contract (Exhibit A) and oral promises thereby causing

serious harm to Mr. Judd and his family when Defendants wrongfully terminated Mr. Judd,

failed to pay his salary, put a stop payment on paychecks rightfully issued to Mr. Judd, failed to

pay his expenses, failed to recognize Mr. Judd's 20% undiluted and non-dilutable ownership of

the Company and failed to give stock documenting Mr. Judd's ownership in the Company.

239.    Bair v. Axiom Design, L.L.C., 20 P.3d 388, 392 (Utah 2001) and MBNA America Bank,

N.A. v. Goodman, 140 P. 3d 589, 591 (Utah Ct. App. 2006) set forth the elements of a prima

facie case for breach of contract.  They are:

   a.       **A contract.** There is a valid signed Contract (Exhibit A) and subsequent oral
agreements re-affirming the validity of the Contract;
   b.       **Performance by the party seeking recovery**. Mr. Judd remained with the
Company bearing the title CEO and performed his duties as CEO of the Company in and by
working to grow the Company MLM business and he did so for the first two years of the
agreement which resulted in vesting his 20% undiluted and non-dilutable ownership interest in
the Company and he did so thereafter and up to the time and date of his wrongful termination;
   c.       **Breach of contract by Defendants.** Defendants have not paid and have refused
to pay Mr. Judd the back salary or expenses (paid from his own pocket) which he is owed.
Defendant Hollingshead wrongfully stopped payment on three paychecks issued to Mr. Judd and
cashed by him. Also, Defendants have not recognized Mr. Judd's 20% undiluted and non-
dilutable ownership in and of the Company, have intentionally and/or negligently stole and
converted to their own use Mr. Judd's shareholder interest in the Company including its dbas as
defined herein, and wrongfully terminated Mr. Judd in violation of the Contract; and
   d.       **Harm.**  There is harm to Mr. Judd requiring that damages be paid to Mr. Judd.
Defendants have refused to recognize Mr. Judd's 20% interest in the Company, have deprived
Mr. Judd of  back salary and expenses owed to him; refused to issue him stock certificates; and
wrongfully terminated him from his position as CEO of the NuWorld Entities.

240.    Under Utah Code Ann. § 16-10a-204, Mr. Hollingshead is personally liable for his

breaches of Contract.

241.    The Contract (Exhibit A) was signed by Mr. Judd and by Mr. Hollingshead personally and as Chairman and then CEO of NuWorld and is thus binding on the Company and on Mr. Hollingshead personally.

242.    The Contract states Mr. Judd was to receive an annual salary beginning June 1, 2005 of 160,000 USD. (Exhibit A, paragraph 1.)  Mr. Judd did not receive $165,768 of this promised salary.

243.    The Contract states, "[s]tart up capital of no less than 150,000 USD will be available for critical Company expenses on or before June 5, 2005." Mr. Judd was issued NuWorld Entities expense checks prepared by Mrs. Tuttle and was paid by the Company for his expenses based on separate expense reports.

244.    Based on Mr. Judd's properly submitted expense reports, the Company owes Mr. Judd $177,793 as reimbursement of and for his money spent while working as CEO for the Company

245.    The Company has breached its agreement and Company policy in failing to reimburse Mr. Judd the salary and expense moneys he is owed.

246.    The Contract states: "As a Company Co-Founder [Mr. Judd is/was to] receive equity in the Company of 20% (unless you [Mr. Judd] determine it expedient, due to the organizational needs of the Company, to revert to an amended equity position of no less than 15%. Your equity will be distributed at intervals over that two year period as determined by the mutually agreed upon performance standards and milestones referred to in item 2 of this Agreement."

247.    Thus 20% non-diluted and non-dilutable ownership in the Company NuWorld, Inc. and

its dbas and any other derivative company of NuWorld fully <u>vested in Mr. Judd on at earliest</u>

<u>May 27, 2007 and at latest June 5, 2007.</u>

248.    Co-founder and 20% co-owner Mr. Judd performed his duties as CEO.  It was in Mr.

Judd's best interest at all times to work aggressively to help the Company succeed.

249.    The only dilution allowed by Exhibit A is specifically at Mr. Judd's sole decision: only

"unless you determine it expedient" might such vested interest reduce to 15%.

250.    Mr. Judd never agreed to accept a 15% ownership interest in the Company. (Exhibit C.)

251.    Vesting was warranted, authorized and therefore took place by terms of the Contract

independent of any formal action by Mr. Hollingshead or the Board of Directors.

252.    Further, Defendants failed to provide a formal reason for termination of Mr. Judd's

responsibilities as CEO, in violation of the Contract (Exhibit A.)

253.    Defendants failed to recognize ownership and give stock for an undiluted and non-

dilutable 20% interest in NuWorld in violation of the Contract (Exhibit A.)

254.    Mr. Judd is owed actual damages in the sum of his $165,768 back salary (per Paragraph

1. of the Contract); his submitted expenses in the sum of $177,793; $12,000 for  salary checks on

which Mr. Hollingshead put a stop payment and which were then charged to Mr. Judd's

accounts; and the value of Mr. Judd's 20% interest in the Company.

255.    The calculation of the value of Mr. Judd's shares may be determined by using a

calculation Mr. Hollingshead has used in the PPM he prepared - or otherwise in raising venture

or debt capital to operate and/or grow the Company at any time - multiplied by the number of

shares Mr. Judd owns, which is the minimum sum of $1,666,666 or $20,000,000, whichever is greater based on the assumption that Mr. Judd owns 1,666,666 shares at $1 each assuming 8,333,333 total shares in the company. (20% is 1,666,666 shares.) The $20,000,000 assumes a valuation on the company of $100,000,000.

### Third Cause of Action
**Breach of Implied Covenant of Good Faith and Fair Dealing**

256.    Plaintiffs reallege and incorporate by reference each and every fact and allegation contained in the preceding paragraphs of this Complaint.

257.    Pursuant to common law and Utah Code Ann. § 70A-1-203, every commercial contract includes an implied covenant of good faith and fair dealing in its performance or enforcement and requires the parties to not intentionally or purposely do anything that will destroy or injure the other parties' right to receive the fruits of that contract.

258.    In order to comply with the covenant of good faith and fair dealing, a party must act consistent with the agreed common purpose and the justified expectations of the other party that are based upon the intentions of the contracting parties, the contract language and the parties' past dealings.

259.    Pursuant to the Agreement and oral assurances made by Defendants, Mr. Judd was entitled to receive compensation for his services as CEO of the NuWorld Entities at a rate of no less than $160,000 per year. Mr. Judd is still owed $165,758 in back salary.

260.    Mr. Judd is also entitled to receive $12,000 for three salary checks, issued by NuWorld, Inc., on which a stop payment was placed and which were then charged to Mr. Judd's accounts.

261.    Defendants also agreed with Mr. Judd that he would be compensated for business expenditures made by Mr. Judd, and he was previously reimbursed for those expenses from NuWorld's checking accounts through checks cut by the Company's bookkeeper.

262.    Defendants also agreed to give Mr. Judd stock certificates further documenting Mr. Judd's 20% undiluted and non-dilutable ownership of the business pursuant to the Contract Exhibit A.

263.    Defendants breached the covenant of good faith and fair dealing by failing to compensate Mr. Judd for his services as CEO, in the amount of $165,768, by putting a stop payment on $12,000 in rightfully-issued salary checks, and by failing to reimburse Mr. Judd for $177,793 in business expenses.

264.    Defendants breached the covenant of good faith and fair dealing by refusing to issue Mr. Judd stock certificates reflecting his undiluted 20% interest in NuWorld, Inc., as promised.

265.    Defendants also breached the implied covenant of good faith and fair dealing by refusing to reimburse Mr. Judd for office rent for the NuWorld Mexico office and for furniture rental.

266.    Instead, Defendants wrongfully terminated Mr. Judd to avoid paying him these amounts and to avoid recognizing his 20% ownership in the Company and to avoid issuing him the promised stock certificates.

267.    As a direct and proximate result of Defendants' breaches of the covenant of good faith and fair dealing, Mr. Judd has been damaged in an amount no less than $20,343,561 or to be determined at trial.

**Fourth Cause of Action**
**Conversion**

268.    Plaintiffs reallege and incorporate by reference each and every fact and allegation

contained in the preceding paragraphs of this Complaint.

269.    A conversion is an act of willful interference with a chattel/personal property, done

without lawful justification by which the person entitled thereto is deprived of its use and

possession. Jones v. Salt Lake City Corp., 2003 UT App 355, P 9, 78 P.3d 988.

270.    As reflected in the Contract (Exhibit A) and subsequent agreements, Mr. Judd was

entitled to stock certificates reflecting his 20% ownership interest in the NuWorld Entities.

271.    Mr. Hollingshead refused to issue Mr. Judd these stock certificates.

272.    Mr. Hollingshead and Defendants also refused to pay to Mr. Judd back wages and back

expenses to which he is rightfully entitled under the terms of the Contract (Exhibit A.)

273.    Mr. Hollingshead and Defendants have also refused to reimburse Mr. Judd rental fees for

the NuWorld Mexico office and for furniture.

274.    Defendants instead used the ruse of ousting Mr. Judd in order to keep his 20% undiluted

and non-dilutable share of the Company including his stock certificates and his salary and

expense money.

275.    Defendants have maintained possession of the stolen shares, the salary and expenses.

276.    Mr. Judd asked for his stock certificates multiple times in the past and Mr. Hollingshead

"stonewalled" Mr. Judd and neglected to give Mr. Judd stock certificates.

277.    The rest of the Defendants including Mr. Tuttle have also neglected to give Mr. Judd his

stock certificates and/or to pay Mr. Judd his back salary and expenses.

278.    Defendants have thereby unlawfully interfered with Mr. Judd's possession of his chattel.

279.    As a result of the foregoing, Mr. Judd is entitled to a conversion judgment against

Defendants in the amount of $20,343,561 plus punitive damages to be determined at trial.

**Fifth Cause of Action**
**Unjust Enrichment/Quantum Meruit**

280.    Plaintiffs reallege and incorporate by reference each and every fact and allegation

contained in the preceding paragraphs of this Complaint.

281.    A claim for unjust enrichment requires the following elements:

1) There must be a benefit conferred by one person on another;
2) The conferee must appreciate or have knowledge of the benefit; and
3) There must be acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value.

Allen v. Hall, 2006 UT 70, ¶ 26, 148 P.3d 939.

282.    By refusing to issue Mr. Judd stock certificates or to recognize Mr. Judd's undiluted 20%

interest in the NuWorld Entities, or to compensate him for an amount reflecting that interest,

Defendants have received a financial benefit from Mr. Judd in an amount not less than

$20,343,561.

283.    By refusing to reimburse Mr. Judd for unpaid salary and expenses, Defendants have

received a financial benefit in an amount not less than $343,561.

284.   Defendants, by willfully refusing to recognize Mr. Judd's 20% interest and/or to compensate him for this interest, have retained the value of the stock for the Company and/or for themselves, and have knowledge of the financial benefit resulting from their actions.

285.   Defendants, by refusing to reimburse Mr. Judd for unpaid salary and expenses, have retained the value of the unpaid salary and expenses for the Company and/or for themselves, and have knowledge of the financial benefit resulting from their actions.

286.   Were Defendants to retain the funds necessary to compensate Mr. Judd for his undiluted 20% interest in the NuWorld Entities and/or the amounts owed to Mr. Judd for unpaid salary and expenses, they would be unjustly enriched.

287.   As a result of the foregoing, Mr. Judd is entitled to an unjust enrichment judgment against Defendants in an amount $20,343,561 plus punitive damages in an amount to be determined at trial.

**Sixth Cause of Action**
**Defamation, Libel, and Slander**
**Defamation *per se***

288.   Plaintiffs reallege and incorporate by reference each and every fact and allegation contained in the preceding paragraphs of this Complaint.

289.   "'Libel' is a malicious defamation—[tending to] impeach the honesty, integrity, virtue, or reputation, or publish the natural defects of one who is alive and thereby expose him to public hatred, contempt, or ridicule." Utah Code Ann. § 76-9-501 (2010).

290.   Pursuant to Utah Code Ann. § 76-9-50, "[a] person is guilty of libel if he intentionally and with a malicious intent to injure another publishes or procures to be published any libel."

291.   A complaint for defamation must set forth "the language complained of, in words or

words to that effect." <u>Dennett v. Smith</u>, 21 Utah 2d 368, 445 P. 2d 983, 984 (1968).

292.   Defendants defamed and libeled Plaintiffs by making the following false statements:

   a.   A June 25, 2009 letter written and/or procured to be published by Defendants
alleges, among other false statements, that Mr. Judd had converted for his own use Company
offices, property, inventory, files and funds; and had interfered with the Company's contractual
relationships with its Mexican distributors.
   b.   Mr. Thorpe e-mailed this letter to many, if not all, distributors of the Company in
the U.S. and Mexico at the direction of Defendants and/or Mr. Hollingshead.
   c.   An e-mail letter written and/or procured to be published by Defendants on June
29, 2009 and in July 2009 alleges, among other false statements, that Mr. Judd had been trying to
take possession of Liv International business in Mexico and had acted with a lack of ethics and
leadership.
   d.   On August 12, 2010 Mr. Saldana and Mr. Attorney Hardman contacted Mr.
Judd's web hosting Company by email and defamed Mr. Judd stating that Mr. Judd had been
terminated, was not honest, and was improperly displaying Company trademarks.

293.   These false statements impeached the honesty, integrity, virtue and business reputation of

Mr. Judd, thereby exposing him and his co-worker Plaintiffs to public contempt and mistrust

among their business associates.

294.   Defendants did so with malicious intent to injure Mr. Judd in his business and

professional reputation.

295.   Defendants have also made the following false, defamatory and slanderous statements:

   a.   In July of 2009, Mr. Hollingshead called Jesse Judd and falsely stated that Harold
was a thief and had stolen Company property.
   b.   In August of 2009, Martha Chavez distributor and employee worked in the Utah
office with John Saldana called Raquel Chavira and said: "Harold has taken from the Company
and that Harold is unethical and that Harold's wife is as guilty as Harold is."
   c.   In August of 2009 and again November 2009, Mr. Hollingshead called Jesse Judd
and said: "Harold is stealing from the Company, trying to keep everything for himself, is
unethical."

      d.     In November of 2009, Mr. Tuttle phoned and stated to Ms. Uribe that Harold had stolen from them, and that he had lied to them and to everyone. Jeff cautioned Lorena to "beware of the false promises of Harold".

      e.     In January of 2010, Mr. Tuttle called Lorena Uribe and told her that "Mr. Judd has no ethics and has simply been living off of them in Mexico and that he had given Harold a list of tasks to do and all Harold did was spend their money with no results."

      f.     Defendants also defamed Mr. Judd in August of 2010 with their Hostway communications as noted above.

296.    Defendants are guilty of a pattern of defamation, libel and slander in emails and phone calls across state lines and country borders as late as August 2010.

297.    In the alternative, Plaintiffs allege Defendants committed defamation *per se* by making the above-stated libelous, slanderous and defamatory comments.

298.    A claim of defamation *per se* requires the defamatory words to fall into one of several charges, including charges of "criminal conduct" or of "conduct that is incompatible with the exercise of a lawful business, trade, profession, or office". <u>Allred v. Cook</u>, 590 P. 2d 318, 320 (Utah 1979).

299.    Defendants' defamatory statements charge Mr. Judd with both criminal conduct and conduct that is incompatible with the exercise of a lawful business, trade, profession, or office.

300.    Defendants by their statements maliciously and with ill will held Mr. Judd and his family up to ridicule, embarrassment, and lost esteem in the opinion of the community alleging criminal conduct which conduct is incompatible with exercise of an MLM business, trade, profession, or office.

301.    Defendants' malicious defamation was calculated to cause Plaintiffs emotional distress and to injure Plaintiffs' business and professional reputations.

302.    Defendants intentionally and maliciously, knowing the falsehood of the defamatory statements, did thereby cause Plaintiffs to suffer emotional distress and harm in the marketplace as a consequence of Defendants' defamation.

303.    These negative and defamatory comments caused key distributors to forego conducting business with Mr. Judd.

304.    Rattray v. City of National City, 51 F.3d 793, 801 (9th Cir. 1994) holds that a plaintiff need only demonstrate falsity by a preponderance of the evidence. In this case the affidavits and documents including Mr. Judd's accounting affidavit (Exhibit C) are sufficient and provide the preponderance of proof required.

305.    Plaintiffs have provided affidavits illustrating the falsity of Defendants' statements, and have provided an accounting (Exhibit C) affidavit for all Company funds and property which Defendants claim Plaintiffs stole. (See Exhibits C and E.)

306.    In addition to amounts set forth above, for this defamation, Plaintiffs requests that Defendants be required and ordered to pay the Judd family $5,000,000 each or a total of $20,000,000, these sums to be separate from any other relief and damages requested by Plaintiffs.

## Seventh Cause of Action
### Intentional infliction of emotional distress

307.    Plaintiffs reallege and incorporate by reference each and every fact and allegation contained in the preceding paragraphs of this Complaint.

308.    In 2009, Defendants exhibited harassing, lewd and retaliatory conduct toward Mr. Judd and his family.

309.    Mr. Hollingshead wrongfully terminated Mr. Judd on June 4, 2009. After his termination and as late as August of 2010, Mr. Judd and his wife were subject to harassing, false and defamatory statements; particularly, Defendants proactively contacted distributors of NuWorld and stated Mr. Judd was dishonest, had stolen Company assets and funds, and had violated Company trademarks.

310.    On June 25, 2009 and June 29, 2009, Defendants e-mailed two separate letters containing similar harassing, false and defamatory statements to most, if not all, distributors who deal with the NuWorld Entities.

311.    Defendants have repeated similar false accusations in phone conversations and e-mails with distributors and members of the general public, and in letters sent to hosting companies, in June and July of 2009 and August of 2010, among other dates.

312.    Mr. Judd and Mrs. Judd were distressed, shocked, embarrassed and humiliated among their business associates and in the marketplace by these false accusations.

313.    Defendants also retaliated against Mr. Judd and his family as early as 2009 when they began pressuring Mr. Judd's daughters to leave the Company.

314.    Shortly before Mr. Judd's wrongful termination, the Defendants emailed Shantell and informed her of alleged complaints about her. They then demoted her to a back cubicle to work only with the Mexican distributors. (Exhibit E.)

315.    Defendants also pressured Stephanie to quit shortly before Mr. Judd was terminated in or about May of 2009.  In spite of her physical limitations following her car accident, Stephanie was relegated to work in the back room and given heavy lifting work which she found extremely difficult to do by herself especially during her accident recovery time.

316.    Mr. Tuttle and Mr. Saldana told Stephanie that customers were complaining about her; in fact, Stephanie was working in the back room and not working with customers at the time.

317.    Mr. Saldana repeatedly made lewd and inappropriate comments to Stephanie and Shantell. (See Exhibit C.)

318.    Among these comments, Mr. Saldana asked Stephanie in August of 2008 if she would do nude or lingerie pictures; he also asked Shantell if she had sex toys and if she would play with them; if she would ever hook up with a girl or with two or more people at a time. (Exhibit E.)

319.    Mr. Saldana would regularly attempt to touch Mr. Judd's daughters by placing his arm around their shoulders or rubbing their necks.

320.    These behaviors of Mr. Saldana made Stephanie and Shantell feel shocked, distressed, embarrassed and extremely uncomfortable and contributed greatly to their leaving the Company. (Exhibit C.)

321.    Mr. Hollingshead and Mr. Tuttle were aware of this harassment and tension and did nothing to stop it. (Exhibits E and C.)

322.    Defendants therefore pursued an outrageous course of conduct, intentionally and/or recklessly, proximately causing Plaintiff Mr. Judd and his family severe emotional distress, shock and other painful emotions.

41

323.    For this intentional infliction of emotional distress, Plaintiffs request and suggest that Defendants be required and ordered to pay $5,000,000 each to Mr. Judd and his family, for an added sum of $20,000,000 in damages.

### Eighth Cause of Action
### Negligent infliction of emotional distress

324.    Plaintiffs reallege and incorporate by reference each and every fact and allegation contained in the preceding paragraphs of this Complaint.

325.    As described above, Defendants pursued an outrageous course of conduct, negligently and proximately causing Plaintiffs severe emotional distress, shock and other painful emotions.

326.    By means of harassing, false and defamatory e-mails, phone calls and letters to Mr. Judd and Mrs. Judd's business associates and members of the general public, Defendants negligently caused Mr. Judd and his wife severe emotional distress, shock, humiliation, and embarrassment. (Exhibit C.)

327.    Mr. Saldana's lewd, sexual and outrageous comments to Stephanie and Shantell Judd (and Defendants' knowledge of and permitting such outrageous behavior by Mr. Saldana) negligently caused Stephanie and Shantell Judd to feel shocked, distressed, embarrassed and extremely uncomfortable. (Exhibit E.)

328.    For this intentional infliction of emotional distress, Plaintiffs request and suggest that Defendants be required and ordered to pay $5,000,000 each to Mr. Judd and his family, for an added sum of $10,000,000 in damages.

### Ninth Cause of Action
**Intentional interference with economic advantage**

329.    Plaintiffs reallege and incorporate by reference each and every fact and allegation

contained in the preceding paragraphs of this Complaint.

330.    A claim of intentional interference with economic advantage arises when:

      a.    Defendants intentionally interfered with the plaintiff's existing or potential
economic relations;
      b.    For an improper purpose **or** by improper means;
      c.    Causing injury to the plaintiff

Anderson v. Tobias, 2005 UT 36, P.20 (Utah 2005).

331.    Defendants intentionally interfered with Plaintiff Harold Judd's existing or potential

economic relations when they proactively contacted Company distributors and made the

following false statements of fact:

      a.    A June 25, 2009 letter written by Defendants was sent to most, if not all Company
distributors in the U.S. and Mexico alleges, among other false statements, that Mr. Judd had
converted for his own use Company offices, property, inventory, files and funds; and had
interfered with the Company's contractual relationships with its Mexican distributors.
      b.    A June 29, 2009 e-mail letter written by Defendants and sent to Company
distributors in Mexico alleges, among other false statements, that Mr. Judd had tried to take
possession of Liv International in Mexico and had acted with a lack of ethics and leadership.
      c.    On August 12, 2010 Mr. Saldana and Mr. Attorney Hardman contacted Mr.
Judd's web hosting Company.  In an attempt to force the web hosting Company to take down
Mr. Judd's web sites, they made several false statements:  that Mr. Judd had been terminated,
was not honest, and was improperly displaying Company trademarks.
      d.    In August of 2009, Martha Chavez distributor and employee working in the Utah
office with John Saldana called Raquel Chavira and said: "Harold has taken from the Company
and that Harold is unethical and that Harold's wife is as guilty as Harold is."
      e.    In August of 2009 and again November 2009, Mr. Hollingshead called Jesse Judd
and said: "Harold is stealing from the Company, trying to keep everything for himself, is
unethical."

     f.     In November of 2009, Mr. Tuttle phoned and stated to Ms. Uribe that Harold had stolen from them, and that he had lied to them and to everyone. Jeff cautioned Lorena to "beware of the false promises of Harold".

     g.     In January of 2010, Mr. Tuttle called Lorena Uribe and told her that "Mr. Judd has no ethics and has simply been living off of them in Mexico and that he had given Harold a list of tasks to do and all Harold did was spend their money with no results."

332.    Defendants made such communications for an improper purpose—to injure Mr. Judd's professional reputation thereby materially damaging his business relations and standing in the marketplace.

333.    Defendants were motivated by ill will, as is evidenced by their behavior in wrongfully firing Mr. Judd, Shantell Judd, Stephanie Judd, and Mr. Judd's brother Jesse from the Company, and then proactively contacting the majority of Company distributors and alleging unprofessional and criminal conduct on the part of Mr. Judd.

334.    Mr. Judd's professional reputation has been damaged; by alleging conduct incompatible with exercise of an MLM business, Defendants have influenced several MLM distributors to forego doing business with Mr. Judd and have given him a poor reputation in the marketplace at a time when Mr. Judd is attempting to start his own business. (Exhibit C.)

335.    For this intentional interference with economic advantage, Plaintiffs request and suggest that Defendants be required and ordered to pay the Mr. Judd an amount to be determined at trial, but not less than $20,000,000.

## Tenth Cause of Action
### Breach of Director and Officer Fiduciary Duties

336.    Plaintiffs reallege and incorporate by reference each and every fact and allegation contained in the preceding paragraphs of this Complaint.

337.    It is the duty of directors and officers of a corporation to act in good faith, with the care of an ordinarily prudent person in similar circumstances and in a manner believed to be in the best interests of the corporation ("Fiduciary Duty").

338.    Corporate articles of incorporation require as a matter of law that directors and officers act in such good faith and not waste or mismanage corporate assets and opportunities.

339.    Defendants Mr. Hollingshead, Mr. Tuttle and Mr. Saldana ("Director and Officer Defendants") in their capacity as directors and or officers each breached their fiduciary duties as chairman, directors, and officers when they violated written and unwritten Company policy and state and federal laws.

340.    Mr. Hollingshead had a duty to raise or personally provide the capitalization for NuWorld, Inc. / the NuWorld Entities; to pay payroll taxes and social security taxes; and to issue W2s.

341.    Mr. Hollingshead breached his Fiduciary Duty when he failed to provide the necessary capitalization for the NuWorld Entities; failed to properly pay payroll taxes and social security taxes to investors, directors and officers; and failed to issue W2s to Company employees, including Mr. Judd.

342.    On information and belief of Mr. Judd, Director Defendants breached their Fiduciary Duty by keeping insufficient formal corporate records for the NuWorld Entities, contrary to Federal Securities regulations.

343.    Director Defendants also failed to maintain arm's length relationship with related entities and failure to observe corporate formalities in terms of behavior and documentation:

a.      Mr. Hollingshead intermingled corporate, investor and personal assets or assets of his many other companies;

b.      The corporate directors are functioning at a minimal level; there are many neglected corporate formalities and protocols including refusing to allow Mr. Judd his voting rights in approving major corporate actions and in the context of duly authorized corporate meetings.

c.      There is also severe undercapitalization of the Company according to standards of capitalization required in the MLM industry.

d.      Defendants have permitted recovery of personally invested funds by the dominant shareholder of the 18% loan taken out by the Company.

e.      Mr. Hollingshead, and even Mr. Tuttle, do and have treated the assets of the corporation as their own.

344.    By virtue of these illegal acts, Defendants should not be afforded the protection of any corporate shield and should be held personally liable to Plaintiffs for their actions.

345.    Pursuant to Utah Code Ann. § 16-10a-204Mr. Hollingshead should be held personally liable to Plaintiffs for his actions.

346.    Regarding waste and mismanagement, the Board of Directors has injured the Company by exposing the Company to the tax code liability under 18 USCS § 371.

347.    Consider the fiduciary duty of Mr. Hollingshead in light of the Gold Standard, Inc., case, US Court of Appeals, Tenth Circuit, April 14, 1992, 961 F. 2d 219. There was a relationship between Mr. Hollingshead and Mr. Judd created by Exhibit A and by on-going business dealings; Mr. Judd and others placed trust in Mr. Hollingshead to give oversight to the finances

46

of the Company including raising of funds; Mr. Judd was justified in placing trust in Mr. Hollingshead because Mr. Hollingshead and others alleged that Mr. Hollingshead had an immense track record as a "millionaire" and owner of multiple companies including finance companies and that he could "fund the Company." (Exhibit C.)

348.    Mr. Hollingshead controlled the Company purse. Mr. Hollingshead understood that Mr. Judd and others in the Company were placing trust in Mr. Hollingshead, and the Board and officers knew that Mr. Judd and others were placing trust in Mr. Hollingshead.

349.    Mr. Judd and the others including the Directors and the officers were placed in an inferior corporate relationship to Mr. Hollingshead because Mr. Hollingshead filed on and controlled the establishment of the Company and its dbas with the exception of NuWorld Mexico.

350.    Mr. Judd and the other Directors and officers and owners were dependent on Mr. Hollingshead to give stock and pay payroll taxes and social security contributions and issue W2s and raise the money for the Company as Mr. Hollingshead promised. Mr. Judd and the other officers and employees turned their decision making on these critical matters over to Mr. Hollingshead. All shareholders including Mr. Judd, Mr. Tuttle, and the officers and the two Directors placed an immense degree of trust in Mr. Hollingshead and Mr. Hollingshead breached and violated his fiduciary duties and that trust.

351.    Plaintiffs also reposed trust and confidence in the other Defendant Directors and Officers, and Defendants by virtue of their positions undertook such trust and assumed such duty to protect Mr. Judd and his 20% undiluted and non-dilutable ownership/investment in the Company.

352.     Mr. Hollingshead and the other Defendant Directors and Officers breached their duties to Plaintiffs and Plaintiffs suffered actual, compensatory, and punitive damages in an amount to be determined at trial.

<u>**Eleventh Cause of Action**</u><br>**Violation of Federal and State Securities and Exchange Commission Regulations**

353.     Plaintiffs reallege and incorporate by reference each and every fact and allegation contained in the preceding paragraphs of this Complaint.

354.     Defendants violated Federal and State securities regulations and laws including breach and violation of the Share Issuance Agreement (the "Contract") to the great harm of Mr. Judd, his family and the Company.

355.     This matter involves the fraudulent offer and sale of several million dollars of securities by Defendants, in particular by Mr. John C. Hollingshead as Chairman and CEO of the Company and on multiple occasions during the time frame 2005 thru 2010.

356.     Defendants used instruments of communication in interstate commerce, e-mails and mails to conduct the fraudulent sale of securities and to solicit investors.

357.     On information and belief, from the year 2007 until the present, on multiple occasions Mr. Hollingshead and the Board of Directors and the Company have fraudulently and or negligently offered stock in the Company without full disclosure (including but not limited to failing to disclose the serious $300,000 tax liability with penalties) to engage participants and investors to work in and invest their time and money in the business.

358.     On May 25, 2005, Mr. Hollingshead engaged Plaintiff Mr. Judd in the Company business

as President and then CEO by offering and granting to Mr. Judd via the Share Issuance
Agreement (Exhibit A) a 20% undiluted non-dilutable co-ownership share of NuWorld
Inc/NuWorld Entities/including dbas.

359.    Since Mary 25, 2005, and in spite of multiple requests, Mr. Hollingshead has
consistently refused to issue Mr. Judd stock certificates reflecting Mr. Judd's 20% interest in the
Company.

360.    Mr. Hollingshead concealed from Mr. Judd, the Directors and investors the fact that the
Company was not up to date on payroll taxes and approximately $300,000 in payroll taxes plus
penalties was owed by the Company to the IRS.

361.    Neither Mr. Judd nor Mr. Tuttle nor Directors nor investors were informed of this
growing IRS payroll tax debt and hence there was fraud in both the offer of stock for any
purpose and the taking of funds from investors in return for stock on the part of Mr.
Hollingshead.

362.    In spite of such undisclosed and mounting payroll tax liability, Mr. Hollingshead
continued to take investor money.

363.    On information and belief, Mr. Hollingshead used investor money to pay down payroll
taxes.

364.    Mr. Hollingshead, by engaging in the conduct described in this Complaint, has violated
and unless enjoined will continue to violate, the antifraud provisions of the federal and state
securities laws especially unless payroll taxes are paid in full and to-date.

365.    By this Complaint, Mr. Judd seeks emergency relief against the Defendants and in

particular against Mr. Hollingshead, including a temporary restraining order and other Court orders (as detailed below), damages, and payment of owed salary and expenses and issuance of stock and payment of damages to Mr. Judd in an amount determined at trial.

### Twelfth Cause of Action
### Violation of Trademarks

366.    Plaintiffs reallege and incorporate by reference each and every fact and allegation contained in the preceding paragraphs of this Complaint.

367.    Mr. Judd did not sign a non-compete and or non-circumvention agreement with NuWorld Entities.

368.    NuWorld Mx is a separate Mexican corporation registered in the names of Mr. Harold J. Judd Dominguez and his wife Diana Sanchez Judd as of March of 2010. Mr. Harold J. Judd Dominguez and his wife Diana Sanchez Judd own 100% of NuWorld Mx.

369.    Mr. Judd is entitled to do business in any legal manner in the U.S., Mexico, or elsewhere and under any legal name he sees fit.

370.    Product NuVital is trademarked in Mexico under first use doctrine by NuWorld Mx and Mr. Judd.  NuWorld Mx and Mr. Judd were the first to use the NuVital trademark in Mexico.

371.    Product Timp is trademarked in Mexico by NuWorld Mx under first use doctrine. NuWorld Mx and Mr. Judd were the first to use the Timp trademark in Mexico.

372.    The product Liv SXinney is trademarked in Mexico by NuWorld Mx by Mr. Harold J. Judd Dominguez as of August 2010. NuWorld Mx and Mr. Judd were the first to use the Liv SXinney trademark in Mexico.

373.    The product Crave is trademarked in Mexico by NuWorld Mx by Mr. Harold J. Judd Dominguez. As of August 2010. NuWorld Mx and Mr. Judd were the first to use the Crave trademark in Mexico.

374.    On August 10, 2010, NuWorld Inc and Liv International violated NuWorld Mx/Mr. Judd's trademarks for NuVital by sending a letter to Hostway Corporation. On August 10, 2010, NuWorld Inc and Liv International violated NuWorld Mx/Mr. Judd's trademarks for Timp by sending a letter to Hostway Corporation. (Exhibit G.)

375.    NuWorld Mx buys NuVital product from the importer NLabs in Cuernavaca, Mexico.

376.    NuWorld Mx then sells the product through distributors in Mexico.

377.    NLabs imports the NuVital product from NuWorld Entities.

378.    NuWorld Mx now has its own import license.

379.    NuWorld Mx manufactures Timp products in Mexico.

380.    NuWorld Mx sells NuVital and Timp products in Mexico.

381.    Funds received from sales are banked in the NuWorld Mx accounts which are controlled by Mr. Judd and used to pay commissions and to pay for products and other expenses such as sales and administrative items (e.g. the salaries for the two Mexico employees, shipping, etc.).

382.    Mr. Judd and his family do not receive any of that money personally.

383.    Mr. Judd is and has been subsidizing sales of NuWorld Mx with his own money in order to keep NuWorld Mx alive.

384.    NuWorld Mx has an accounts payable owing NLabs in Mexico.

385.    NuWorld Mx is obligated to pay NLabs.

386.    NLabs is obligated to pay NuWorld Entities.

387.    On information and belief, NuWorld Entities sold Liv SXinney and Crave products to distributors in the U.S. knowing that distributors would take the product into Mexico for resale.

388.    In doing so, NuWorld Entities violated NuWorld Mx's and Mr. and Mrs. Judd's trademarks for Liv SXinney and Crave.

389.    In doing so, NuWorld Entities violated Mexican import laws.

390.    Plaintiffs request judgment in their favor and an amount as determined at trial.

**WHEREFORE, Plaintiffs pray that the Court grant them relief as follows:**

1.    Award Plaintiffs judgment against Defendants in the amounts set forth in Plaintiff Harold Judd's Affidavit of Accounting ( Exhibit C) which is incorporated herein by reference but not less than $50,671,075 as set forth above, and an additional award for attorney's fees and costs incurred;

2.    Award judgment against Defendants for violation of Trademarks and grant damages;

3.    Order Defendants and/or the NuWorld Entities to issue stock certificates to Mr. Judd within 30 days of entry of Judgment (via a legitimate stock transfer Company of Plaintiff's choosing) for an undiluted and non-dilutable 20% of any and all common and preferred stock in NuWorld Enterprises;

4.    Order Defendants to forfeit an additional undiluted and non-dilutable 50,000 shares for each day of willful non-compliance with the court-ordered issuance of stock to Mr. Judd;

5.    Order Defendants and/or the NuWorld Entities to reinstate Mr. Judd as CEO of the Company;

6.      Order Defendants and/or the NuWorld Entities to remove Mr. Hollingshead as Chairman; and

7.      Award emergency injunctive relief against the Defendants and in particular against Mr. Hollingshead, including: a temporary restraining order; an asset freeze on Mr. Hollingshead's personal and many Company assets, an order repatriating any assets he may have that are Company related; a full accounting at Mr. Hollingshead's expense of Mr. Hollingshead's expenses/expenditures and NuWorld-related investment money; an order prohibiting the destruction of any electronic or physical documents; an order expediting discovery, preliminary and permanent injunctions; disgorgement with prejudgment interest; and an order for an immediate jury trial.

        DATED this 29th day of October, 2010

                                        /s/ Adam D. Ford
                                        Adam D. Ford
                                        Managing Partner, Ford & Huff LC

**Table of Exhibits**

Exhibit A      Letter of Commitment

Exhibit B      Termination Letter

Exhibit C      Affidavits of Harold Judd & Diana Judd

Exhibit D      John Hollingshead Private Placement Memorandum

Exhibit E      Affidavits of Shantell Judd & Stephanie Judd

Exhibit F      Defamatory Thorup Letter

Exhibit G      Letters to Web Hosting Companies

Exhibit H      July 2, 2009 Announcement